# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**CAMILLE LOYA,**

            **Plaintiff,**

     **v.**

**KATHLEEN SEBELIUS, Secretary of Health and Human Services,**

           **Defendant.**

</td><td>

**Civil Action 08-01710  (RCL)**

</td></tr>
</table>

## MEMORANDUM OPINION AND ORDER

Plaintiff Camille Loya brings this action against Kathleen Sebelius, in her official capacity as the Secretary of Health and Human Services ("HHS").[1]  She asserts that HHS discriminated and retaliated against her on the basis of her race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and failed to reasonably accommodate her disability in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*  Before the Court is the motion of HHS for summary judgment [Dkt. # 26].  Upon consideration of the motion, the opposition thereto, and the record of the case, the Court concludes that the motion should be granted in part and denied in part.

---

[1]	The complaint named Michael O. Leavitt, former Secretary of HHS, as the defendant in this case.  Kathleen Sebelius, the current Secretary, is substituted as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

Camille Loya is a Mexican-American woman with Type I diabetes.  Def.'s Mot. for

Summ. J. ("Def.'s Mot."), Ex. 1 (Dep. of Camille Loya (Sept. 14, 2010)) ("Loya Dep.") at 5, 7.

She has been employed by HHS since 1995.  *Id.* at 10.  During the relevant time period, Loya

served as Senior Advisor to the Director of the Office of Head Start ("OHS").  *Id*. at 64.

Between 2006 and early 2007, Loya worked closely with Ann Linehan, the Division

Director for the Division of Program Management at OHS.  *Id*. at 30–31.  Their work together

focused primarily on monitoring reports from on-site reviews of OHS grantees.  *Id.* at 30.  Much

of their work took place at Linehan's house in Virginia.  *See id.* at 27.

In 2007, this work arrangement ended, and Loya's responsibilities changed.  Linehan had

complained about Loya's behavior and requested that Loya no longer be assigned to monitoring

reports, claiming that Loya caused her "extreme duress" and made her fear for her safety.  *See*

Def.'s Mot., Ex. 2 (Dep. of Ann Linehan (Mar. 25, 2010)) ("Linehan Dep.") at 24–25.  Loya had

also expressed an interest in performing different work.  Loya Dep. at 32.  According to Loya,

her working relationship with Linehan had become "difficult," so it seemed "natural[]" for her to

be assigned new responsibilities, given her desire to do different work and the timing of the

reauthorization of the Head Start Act.  *Id*. at 34–35.

Soon thereafter, however, Loya felt that her responsibilities had been diminished far

beyond the loss of monitoring duties, which she had voluntarily given up.  For instance, she was

no longer involved in broad policy discussions about program operations, and she began to be

excluded from meetings and training events.  *Id.* (estimating that her portfolio of work was

diminished by 80 percent). She believed that the reduction in responsibilities was attributable to discrimination. *Id.* at 37–38.[2]

On or about June 4, 2007, Loya complained of discrimination to her supervisor Channel Wilkins, who was director of OHS. *Id.* at 36. She asserted that she was being discriminated against and harassed based on her race and national origin by Linehan and the Deputy Director of OHS, Frank Fuentes. *Id.* at 36–38; *see also* Pl.'s Opp'n, Ex. 1 (EEO Aff. of Camille Loya) ("Loya EEO Aff.") at 3. Some time after Loya's complaint, the Office of the Inspector General ("OIG") launched an investigation into Linehan's conduct with respect to contract irregularities. Def.'s Mot., Ex. 4 (Dep. of Frank Fuentes (Mar. 19, 2010)) ("Fuentes Dep.") at 81; Loya Dep. at 59–60.[3] For the duration of the investigation, Linehan was moved to an office approximately three blocks away from her normal office. The investigation cleared her of any wrongdoing and, after its completion, Linehan sought to return to her former office. Linehan Dep. at 40–42.

In the late fall of 2007, Patricia Brown, who had recently replaced Wilkins as the Acting Director of OHS, consulted with Gloria Patterson of the Office of Employee Relations about Linehan's request to return to her former office—in the Portals building, which also housed Loya's office—and the hostility that existed between Linehan and Loya. Brown Dep. at 21–23;

---

[2]     In her declaration, Loya states that OHS management also removed certain responsibilities following her complaints of discrimination. *See generally* Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), Ex. 12 (Decl. of Camille Loya (April 8, 2011)) ("Loya Decl.").

[3]     The reason for this investigation is unclear. HHS asserts that Loya filed an anonymous report with the OIG, Def.'s Mem. in Support of Def.'s Mot. for Summ. J. ("Def.'s Mot.") at 6; *see* Fuentes Dep. at 81–82 (alleging that Loya admitted to filing the anonymous complaint), but Loya has denied contacting the OIG. *See* Loya Dep. at 59–60 (stating that she complained about Linehan to Wilkins but denying any recollection of contacting the OIG).

*see also* Pl.'s Opp'n, Ex. 5 (Dep. of Gloria Patterson (April 30, 2010)) ("Patterson Dep.") at 40.[4]

They determined that either Linehan or Loya would have to be permanently stationed in the

Aerospace building, where Linehan had been working since the investigation.  Brown Dep. at

23.  Fuentes asked both Loya and Linehan if either would be willing to work in the Aerospace

building; both refused.  Fuentes Dep. at 36–37; Linehan Dep. at 40; Loya Dep. at 62.

Brown and Fuentes then decided to move Loya to the Aerospace building over her

objection.  They explained that Linehan had a greater need to be in the Portals building because

she had a staff to supervise there, which Loya did not.  Fuentes Dep. at 81; Def.'s Mot., Ex. 15

(Email from Frank Fuentes to Gloria Patterson (Jan. 9, 2008)); Brown Dep. at 21, 35–36.

Accordingly, in January 2008, Fuentes directed Loya to move to the Aerospace building.  Loya

Dep. at 62.  Her office was officially relocated, but Loya often worked out of the Portals building

anyway.  *Id.* at 67–68.

Loya alleges that, by the time of her transfer to the Aerospace building, her job

responsibilities had been significantly eroded and that the move contributed to the diminishment

of her role at OHS.  *See generally* Loya Decl.  Loya also asserts that the relocation to the

Aerospace building caused her adverse health consequences.  *Id.* ¶¶ 19–20.  Travel back and

forth to the Portals building, especially for "unanticipated meetings," made it difficult for Loya

to manage her diabetes.  *Id.* ¶ 20.  Loya requested permission to return to her office in the Portals

building, citing her diabetes, but her request was not granted.  *See* Pl.'s Opp'n, Brown Dep. at

66.  Due to the frequently wet or icy conditions on the path between the buildings, Loya

---

[4]     This meeting involved Brown, Patterson, and Charles Keckler, who was the deputy
secretary for the acting assistant secretary.  Brown Dep. at 21; *see also* Patterson Dep. at 40.

struggled with the walk between the buildings and, at one point, fell and injured her ankle.  Loya

Decl. ¶ 18.  Although there was a shuttle bus that ran regularly between the two buildings,[5] Loya

appears not to have used it.  On March 15, 2011, Loya was formally allowed back to the Portals

building and was thereafter given the position of Tribal Policy Lead for OHS.  *Id.* ¶¶ 23, 24.

## II.  LEGAL STANDARD

A motion for summary judgment should be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(a).  A material fact is one that "might affect the outcome of the suit

under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The

movant must support its factual positions by "citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations,

stipulations . . . , admissions, interrogatory answers, or other materials." FED. R. CIV. P.

56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets its burden, the non-moving party must then establish that a

genuine dispute as to any material fact actually exists.  *See Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 586 (1986).  To meet its burden, the non-moving party must show

that "the evidence is such that a reasonable jury could return a verdict" in its favor.  *Anderson*,

477 U.S. at 248.  Such evidence must consist of more than mere unsupported allegations or

denials and must set forth specific facts showing that there is a genuine dispute for trial.  *See*

FED. R. CIV. P. 56(c)(1), (e); *Celotex*, 477 U.S. at 322 n.3.  If the evidence adduced by the non-

---

[5]     It is unclear how frequently the shuttle ran between the two buildings.  Loya testified that
it ran "every 50 minutes or so."  Loya Dep. at 66.  Fuentes testified that he believed it ran every
"[t]wo hours, every hour and a half, something like that."  Fuentes Dep. at 82.

moving party is "merely colorable" or "not significantly probative," summary judgment may be granted to the movant. *Anderson*, 477 U.S. at 249–50.

## III.  ANALYSIS

### A.      Title VII Claims

"Title VII prohibits federal agencies from discriminating in employment on the basis of [race and national origin], and from retaliating against employees for the assertion of their rights under Title VII." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (internal citations omitted).  Title VII claims have long been assessed under the burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–03 (1973), which gives the plaintiff the initial burden of establishing (by a preponderance of the evidence) a prima facie case of discrimination or retaliation, *see Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981), then shifts the burden to the defendant "'to articulate some legitimate, nondiscriminatory reason'" for the decision in question, *id*. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802), after which the plaintiff has an opportunity to prove (again by a preponderance of the evidence) "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Id.*  The *McDonnell Douglas* framework only burdens an employer with the obligation to explain its actions when a plaintiff can prove a prima facie case of discrimination; the prima facie requirement limits the circumstances under which employers, who are generally free to act, must justify their actions in Title VII litigation.  *See Cline v. Catholic Diocese*, 206 F.3d 651, 660 (6th Cir. 2000)  Therefore, as the Court of Appeals has recently explained, if "an employer has [already] asserted a legitimate, non-discriminatory

6

reason for the decision," the requirement that the plaintiff establish a prima facie case serves no further purpose. *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  In such circumstances, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Id.*; *see also Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (applying *Brady* in the retaliation context). Instead, the district court should decide only the ultimate question of whether the plaintiff has put forward enough evidence to support a finding of discrimination or retaliation. *Brady*, 520 F.3d at 494.  On this motion for summary judgment, the Court will therefore determine whether any reasonable jury could conclude that Loya has proffered enough evidence to support such a finding, without first considering whether she has made out a prima facie case.

### 1.    Office Relocation

Loya asserts that HHS relocated her office to the Aerospace building in retaliation for her allegations of discrimination.[6]  HHS disputes that the relocation of Loya to the Aerospace building constitutes a material adverse employment action, but argues that, even if it does, HHS

---

[6]    Loya's complaint purports to bring Title VII claims based on both retaliation and discrimination.  To the extent that she bases a discrimination claim on her office relocation, the Court finds she has conceded that argument.  In its motion for summary judgment, HHS argues that the office relocation did not constitute an adverse action under the standards applicable to either discrimination or retaliation claims.  Def.'s Mot. at 15–18.  In her opposition, Loya argues only that the relocation constituted a materially adverse action that could deter a reasonable employee from complaining of discrimination.  Pl.'s Opp'n at 27–28.  She does not argue that the relocation is an adverse action under the more stringent standards applicable to discrimination claims.  Accordingly, the Court finds that Loya has conceded that her office relocation does not constitute an adverse employment action for the purpose of a discrimination claim.  *See Lewis v. District of Columbia*, 2011 WL 321711, at *1 (D.C. Cir. Feb. 2, 2011) ("'It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.'") (quoting *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd* 2004 WL 1178772 (D.C. Cir. May 27, 2004)).

has provided a legitimate and nonretaliatory reason for doing the action.  Because a materially adverse action is an "essential element" of a retaliation claim, *see Baloch v. Kempthorne*, 550 F.3d 1191, 1195 (D.C. Cir. 2008), the Court will first consider whether Loya's office relocation constitutes such an action, and then proceed to consider whether a reasonable jury could find that HHS's proffered reason for taking that action is a pretext to disguise a retaliatory motive.

### a.    Materially Adverse Action

To prevail on a retaliation claim, a plaintiff must demonstrate that she suffered a materially adverse employment action.  "An employment action is materially adverse where it 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  Unlike discrimination claims, "[r]etaliation claims are 'not limited to . . . actions that affect the terms and conditions of employment' and may extend to harms that are not workplace-related or employment-related so long as 'a reasonable employee would have found the challenged action materially adverse.'"  *Baloch*, 550 F.3d at 1198 n.4 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68 (2006)).  Loya argues that the office relocation made her job significantly more arduous.  Specifically, she contends that her involuntary relocation to the Aerospace building isolated her from her colleagues and made it more difficult for her to complete her job duties, Loya Dep. at 71, diminished her standing as a senior staff member, Loya Decl. ¶¶ 11–12, and contributed to a loss of responsibilities and exclusion from senior-level meetings.  *See id*. ¶¶ 2, 7–9.  She further asserts that the path she was forced to travel between the buildings was frequently wet or icy, leading to dangerous walking conditions, *id*. ¶ 18, that the relocation made it more difficult to

manage her diabetes, *id.* ¶ 19, and that the relocation cut her off from access to administrative support services, Fuentes Dep. at 73–74.

Based on this evidence, a reasonable jury could find that Loya suffered a materially adverse employment action. *Cf. Gill v. Mayor of Dist. of Columbia*, 2007 WL 1549100, at *4 (D.D.C. May 25, 2007) (holding that the plaintiff's complaint alleged an adverse employment action where her relocation from a counseling office into a common area "was not conducive to her assigned duties of counseling students"); *Prince v. Rice*, 453 F. Supp. 2d 14, 29 (D.D.C. 2006) ("It may be that, in some cases, relocation to a significantly less desirable work space might deter a reasonable employee from filing a complaint of discrimination (or otherwise engaging in protected activities)."); *Trout v. Hidalgo*, 517 F. Supp. 873, 890 n.67 (D.D.C. 1981) ("Among other discriminatory actions taken against Ms. Bach [was] . . . the removal of her office to an undesirable location . . . ."), *aff'd in part and rev'd in part sub nom. Trout v. Lehman*, 702 F.2d 1094 (D.C. Cir. 1983), *vacated on other grounds*, 465 U.S. 1056 (1984). Involuntary relocation to a less desirable building that is isolated from all co-workers—especially when the relocation substantially interferes with the performance of job responsibilities—could well dissuade a reasonable worker from complaining of discrimination.

### b.       Evidence of Pretext

HHS next argues that it had a legitimate, non-discriminatory reason for relocating Loya: management believed that Loya and Linehan could not work in the same building without substantial friction between the two and, after considering each of their responsibilities, concluded that it was Loya who should be relocated. Def.'s Mot. at 17. Loya responds that this explanation is mere pretext to disguise management's retaliatory motive for relocating her. She

offers two arguments in support of her position: (1) that HHS's proffered reason for her relocation has shifted over time; and (2) that the proffered explanation is not believable. The Court will address both arguments to determine whether a reasonable jury could conclude that HHS relocated Loya in retaliation for her protected activity.

### i.    No Reasonable Jury Could Find HHS's Proffered Explanations for Loya's Relocation To Be Materially Inconsistent.

Loya contends that HHS's explanation for her relocation has changed over time. Originally, HHS indicated that Loya was relocated because of Linehan's allegations of Loya's hostile behavior. Now HHS describes a more mutual incompatibility, claiming that Loya and Linehan were not able to work together. Loya argues that a reasonable jury could infer pretext from these shifting rationales. *See Sw. Merch. Corp. v. NLRB*, 53 F.3d 1334, 1344 (D.C. Cir. 1995) (holding that the jury could infer pretext and unlawful discrimination from an employer's shifting and inconsistent explanations for its action). HHS's explanations, however, are not materially inconsistent.

The record indicates that Linehan's allegations about Loya's hostile behavior were the primary reason that management determined that Loya and Linehan should not work in the same building. *See* Brown Dep. at 21–23; Fuentes Dep. at 37–39. Indeed, HHS has never denied the role that Linehan's allegations played in Loya's relocation. But the negative sentiments were not one-sided. Loya herself admitted to complaining frequently about Linehan's behavior. *See* Loya Dep. at 59 ("I believe on a fairly frequent basis I complained about Ms. Linehan's conduct towards me."). It is reasonable—and not materially inconsistent—for HHS to indicate that there was a need to separate the two women because of Linehan's complaints and also because they could not work together, as evidenced by each of their complaints about the other. These

explanations may reflect a change in emphasis, but they are compatible with each other and are supported by the record.

Accordingly, the Court finds that HHS's proffered explanation for relocating Loya has not materially changed over time such that a reasonable jury could infer that the explanation is merely pretextual.  *See Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 27–28 (D.D.C. 2009) (finding that "minor variances in testimony are not the type of material inconsistency or contradictory testimony from which a reasonable jury could infer that [the defendant's] proffered reasons are pretextual"); *see also Edwards v. EPA*, 456 F. Supp. 2d 72, 91 (D.D.C. 2006) (holding that plaintiff had failed to "'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [defendant's] reasons that a reasonable factfinder could rationally find them unworthy of credence'") (quoting *Abramson v. William Paterson Coll.*, 260 F.3d 265, 283 (3d Cir. 2001)).

> ii.     **A Reasonable Jury Could Not Conclude that HHS's Proffered Explanation for the Relocation Was Pretext.**

Loya next argues that although HHS claims to have moved Loya to the Aerospace building in response to Linehan's allegations about Loya's hostile behavior, this proffered explanation is not credible because HHS did not investigate the allegations or even ask Loya for her account of the events in question.  In so arguing, Loya neither contests that hostility existed between her and Linehan, nor contends that she is innocent of the conduct about which Linehan complained.  Instead, she contends that a reasonable jury could find it unbelievable that management would relocate Loya based on vague accusations that were not investigated.  The Court disagrees.

Failure to investigate allegations of misconduct does not by itself raise the inference that the allegations were not the real reason for the employment action. *See Marcelus v. CCA of Tenn., Inc.*, 691 F. Supp. 2d 1, 5 (D.D.C. 2010) ("Even if the plaintiff is correct that the investigation and his subsequent discharge were somehow unfairly rigged, that fact *alone* does not establish unlawful discrimination . . . .") (footnote omitted); *see also Rivera-Aponte v. Rest. Metropol #3, Inc.*, 338 F.3d 9, 11–12 (1st Cir. 2003) (holding that the cursory nature of a pre-termination investigation and failure to consult the plaintiff on his side of the story did not indicate that the termination decision was made with discriminatory animus). Here, the record supports the conclusion that, given the admitted hostility between Loya and Linehan, OHS management sought to separate the two individuals. *Cf.* Patterson Dep. at 42 (stating that OHS management's "goal was to minimize as much of the hostilities as possible"). Loya is unable to present any evidence that could lead a reasonable jury to find that OHS management did not honestly and reasonably believe that Loya and Linehan needed to be separated. *See Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247–48 (D.C. Cir. 2011) (holding that the defendants' "honest[] and reasonabl[e]" belief that the plaintiff's working style was incompatible with her boss such that she should be terminated was sufficient to grant summary judgment for the defendants).[7] Although the decision to relocate Loya without investigating the underlying

---

[7]    At oral argument before the Honorable Henry H. Kennedy, Jr., counsel for Loya argued that OHS management's recent decision to allow Loya to return to the Portals building undermines the assertion that Loya and Linehan ever needed to be separated. But the relevant inquiry is not whether OHS management was correct in their determination that Loya and Linehan needed to be separated; instead, the question is whether management honestly believed at the time that they needed to be separated. OHS's recent decision to allow Loya to return to the Portals building does not shed light on the motivation behind its original decision to relocate Loya. Furthermore, it is reasonable for OHS management to have determined that Loya now may return to the Portals building given the passage of three years with no complaints from either Linehan or Loya about the other.

allegations may have been unfair or ill-advised, such questions are not before the Court. *Marcelus*, 691 F. Supp. 2d at 6 ("In short, the law does not prohibit employers from treating their employees 'unfairly' so long as that treatment is not the product of *unlawful* discriminatory intent."); *Hairsine v. James*, 517 F. Supp. 2d 301, 308–09 (D.D.C. 2007) ("A personnel decision can be silly, it can be unfair, and it can be short-sighted without being illegal; Title VII protects against discriminatory decisions, not wrong ones.").

Loya cites *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 590 (5th Cir. 1998), in support of her argument that when an employer takes action based on an accusation of misconduct without investigating the matter, it raises the inference that the accusation was not the true reason for the employer's action. Pl.'s Opp'n at 31. This case is readily distinguishable from *Deffenbaugh-Williams*, however. In *Deffenbaugh-Williams*, a supervisor terminated the plaintiff for allegedly "shopping on the clock," even though the plaintiff's spouse informed the supervisor that he, not the plaintiff, had purchased the product at issue—a statement that could have been confirmed by employees who witnessed the purchase. *Deffenbaugh-Williams*, 156 F.3d at 590. The Fifth Circuit found that the supervisor's failure to investigate, even when confronted by the spouse's version of events, suggested that "shopping on the clock" was not the real reason for the plaintiff's termination, especially when taken in conjunction with evidence that other employees had purchased items during their shifts and had not been terminated. *Id.* By contrast, here, there is no contradictory evidence, such as the spouse's version of events, which would seem to beg investigation. Nor does Loya put forward any evidence that similar accusations were typically investigated. Moreover, the veracity of the underlying allegation is

not as important in this case, where the employer was attempting to mitigate hostility between

two co-workers, rather than to punish either of them.

Loya points to no other evidence beyond the failure to investigate Linehan's allegations

that could lead a reasonable factfinder to disbelieve HHS's explanation that Loya was relocated

to separate her from Linehan. Accordingly, there is no genuine dispute as to whether HHS's

proffered explanation for Loya's relocation was pretextual. The Court will therefore grant

HHS's motion for summary judgment on this claim.

### 2.    Diminution in Responsibilities

Next, Loya argues that HHS discriminated and retaliated against her for complaining of

discrimination by significantly reducing her professional responsibilities. *See* Loya Dep. at

37–38 (asserting that approximately 80 percent of her work portfolio was taken away because of

racial animus); Loya Decl. ¶¶ 2–9 (describing the responsibilities taken away following her

complaints of discrimination).[8] In so doing, Loya correctly asserts that such a reduction in

---

[8]    Although Loya brings both retaliation and discrimination claims based on the reduction
in her responsibilities, the Court notes that there are uncertainties about the basis for her
retaliation claim. In her deposition, Loya claims that the diminishment in her responsibilities
began in the "winter" of 2007 and "by the time we got to the spring, you know, April, May,
June, it became apparent to me that things – that my – my place in the office was changing and I
couldn't . . . find a legitimate reason for why I was not involved in [meetings]." Loya Dep. at
45–46. Loya first engaged in protected activity on June 4, 2007 when she complained of
discrimination, *id.* at 36; that complaint stemmed in part from her reduction in work
responsibilities. *Id.* at 36–37. As should be obvious, any reduction in responsibilities that
occurred *prior* to her complaint of discrimination could not have been in retaliation for her
complaint. Her deposition testimony is not specific, however, as to which responsibilities she
had already lost prior to her discrimination complaint, *id.* at 37 (indicating that the diminishment
of her work portfolio by "80 percent" and her exclusion from "discussions about broad policy"
caused her to complain of discrimination), but her declaration avers specific responsibilities that
were taken away after she complained of discrimination. Loya Decl. ¶¶ 2–9. Accordingly,
drawing all factual inferences in Loya's favor, the Court will presume that Loya's retaliation
claim is premised only on responsibilities that were removed *after* her June 4, 2007
discrimination complaint.

responsibilities can constitute an adverse employment action.  *See Czekalski v. Peters*, 475 F.3d 360, 364–65 (D.C. Cir. 2007) (holding, in a discrimination claim, that reassignment "with significantly diminished responsibilities" constituted an adverse action); *see also Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (finding, in a retaliation claim, that a jury could find that the plaintiff suffered an adverse action where "her duties dramatically declined in both quantity and quality" for years); *Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003) ("[W]ithdrawing an employee's supervisory duties constitutes an adverse employment action[.]").

In response, HHS puts forward two explanations for the reduction in Loya's responsibilities: (1) that Loya "expressed [the] desire to change what she was doing because she no longer wanted to work with Ms. Linehan"; and (2) that it "should have been no surprise" that, as Special Assistant to the Director, Channel Wilkins, Loya's responsibilities would change when Wilkins departed in September 2007.  *See* Def.'s Reply at 2.  A reasonable jury could find that both explanations fail to account for the broad range of responsibilities taken from Loya.

HHS notes that Loya requested new responsibilities to replace the monitoring duties that had required her to work with Linehan.  *See* Loya Dep. at 32–35.[9]  But the responsibilities about which she complains of losing do not appear to be related to these monitoring duties.  For instance, after Loya complained of discrimination, she asserts that various senior-level responsibilities were removed from her work portfolio.  She was, she says, uninvited from senior

---

[9]     The record indicates that, apart from or in addition to Loya's request not to work on monitoring duties, OHS management also determined that Loya should not have any continued involvement in monitoring work as a part of its efforts to separate Loya and Linehan.  *See* Fuentes Dep. at 31 (stating that Loya's monitoring duties were removed as a result of Linehan's complaints about Loya's conduct).  Loya testified, however, that the change in her responsibilities went far beyond just the elimination of monitoring duties.  Loya Dep. at 37.

staff meetings, deprived of the responsibility to serve as the liaison between OHS and the Office of the General Counsel ("OGC") and of the duties attendant on that role, and excluded from meetings with OGC.  *See* Loya Decl. ¶¶ 4, 6, 8.  Furthermore HHS's suggestion that Loya's responsibilities changed because of Wilkins's departure finds no support in the record.[10] Therefore, a reasonable jury could find the explanations proffered by HHS fail to account for Loya's loss in responsibilities.

In most circumstances, plaintiffs need not present evidence above and beyond the falsity of the employer's nondiscriminatory reason to defeat summary judgment.  *See Colbert v. Tapella*, 649 F.3d 756, 759 (D.C. Cir. 2011); *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1292 (D.C. Cir. 1998) (en banc) (stating that "'no additional proof of discrimination is required' as a matter of course once a plaintiff has shown that a jury could reject the employer's proffered explanation" (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." (internal emphasis omitted)).  This is because the jury may give considerable evidentiary significance to the plaintiff's rebuttal of the employer's own explanation of its challenged acts.  *Aka*, 156 F.3d at 1292–93; *see also Reeves*, 530 U.S. at 147 ("Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.").

---

[10]     Moreover, there is some evidence that Loya reports to the Deputy Director for OHS, not the Director.  *See* Brown Dep. at 33–34.

The D.C. Circuit has recognized two categories of exceptional cases in which a showing that an employer's explanation was false would be insufficient to avoid summary judgment: (1) where "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision," and (2) "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Colbert*, 649 F.3d at 759 (quoting *Reeves*, 530 U.S. at 148) (internal quotation marks omitted). This case does not fit in either category. The record does not "conclusively" reveal any other possible nondiscriminatory or nonretaliatory reason that would account for the breadth of Loya's reduction in responsibilities. Further, the record does not provide "abundant and uncontroverted independent evidence," *id.* (quoting *Reeves*, 530 U.S. at 148), such as a "strong record of equal opportunity employment," *id.* (quoting *Aka*, 156 F.3d at 1291), indicating that no discrimination or retaliation occurred. To the contrary, Loya asserts that, under Fuentes, OHS's employment practices are inhospitable to non-Puerto Rican Hispanics, including Mexican Americans like Loya.[11]

---

[11]    She asserts that "Mr. Fuentes has made remarks about Mexicans being lazy and not as intelligent as others, and declared that he'd never hire a Mexican." Loya EEO Aff. at 5. In addition, she avers that Fuentes gave preferential treatment to Puerto Ricans and discriminated against non-Puerto Rican job and internship applicants of Hispanic origin. *Id.*; *see also* Pl.'s Opp'n Ex. 11 (Decl. of Maiso Bryant (April 8, 2011)) ¶ 4. Further, there is evidence that Fuentes falsely asserted that he believed Loya to be Portuguese American instead of Mexican American. Fuentes Dep. at 79–80; Fuentes Decl. at 2 ("I was never aware that [Loya's] national origin was Mexican American — she used to tell me she was Portuguese."); *but see* Loya EEO Aff. at 5 (noting that she told Fuentes that she was Mexican American); Loya Dep. at 40 (recalling a conversation with Fuentes and a third party where the third party noted that Loya was Mexican American). A reasonable jury could credit Loya's testimony and find that Fuentes lied about his knowledge of Loya's national origin to cover up his discriminatory animus.

Accordingly, because a reasonable jury could conclude that HHS's proffered nondiscriminatory explanation is pretext for discrimination or retaliation, the Court will deny HHS's motion for summary judgment on Loya's Title VII discrimination and retaliation claims arising out of the reduction in her responsibilities.[12]

## B.    Rehabilitation Act Claim

### 1.    Legal Standard under the Rehabilitation Act

Under section 501 of the Rehabilitation Act, federal employers must act affirmatively on behalf of disabled individuals.  29 U.S.C. § 791(b); *see also Se. Cmt. Coll. v. Davis*, 442 U.S. 397, 410–11 (1979).  Specifically, a federal agency shall "make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless the [agency] can demonstrate that the accommodation would impose an undue hardship on the operations of its business."  29 C.F.R. § 1630.9(a); *see also Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993) ("[Section 501's] basic tenet is that the Government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result.").[13]  To determine the appropriate reasonable accommodation, the agency should

---

[12]    In addition to claims based on the relocation of her office and the alleged diminishment of her responsibilities, Loya's complaint references three other employment actions that could give rise to Title VII claims: a threatened reassignment of Loya to the Office of Refugee Resettlement, Loya's non-selection to a supervisory social science analyst position, and her performance appraisal in 2007.  Compl. ¶¶ 10–11, 17–19.  In its motion for summary judgment, HHS argues that Loya was never "threatened" with reassignment to ORR, and that neither the non-selection nor the performance appraisal were discriminatory or retaliatory.  *See* Def.'s Mot. at 9, 18–21.  Loya did not respond to these arguments; accordingly, the Court deems them conceded.  *See Lewis*, 2011 WL 321711, at *1.

[13]    The regulatory provisions applicable to the Americans with Disabilities Act supply the standards used to determine whether a federal agency has violated section 501 of the Rehabilitation Act.  *See* 29 U.S.C.A § 791(g); 29 C.F.R. 1614.203(b).

"initiate an informal, interactive process with the qualified individual with a disability in need of accommodation." 29 C.F.R. § 1630.2(o)(3).  "[A]n employer is not required to provide an employee that accommodation [s]he requests or prefers, the employer need only provide some reasonable accommodation." *Aka*, 156 F.3d at 1305 (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996)) (internal quotation marks omitted).

To establish a prima facie case of discrimination under the Rehabilitation Act for an employer's failure to reasonably accommodate a disability, "a plaintiff must show '(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make the accommodation.'" *Woodruff v. LaHood*, 777 F. Supp. 2d 33, 39 (D.D.C. 2011) (quoting *Graffius v. Shinseki*, 672 F. Supp. 2d 119, 125 (D.D.C. 2009)).

### 2.    HHS's Alleged Failure to Accommodate Loya's Diabetes

Loya has Type I insulin-dependent diabetes.[14]  She asserts that her diabetes made traveling between the Aerospace and Portals buildings dangerous to her health.  Due to this asserted health risk, she requested that HHS allow her to move back into the Portals building. *See* Pl.'s Opp'n, Brown Dep. at 66.[15]  HHS did not grant the request, and Loya argues that this

---

[14]    HHS does not contest that diabetes meets the definition of a disability under the Rehabilitation Act.

[15]    At oral argument, counsel for HHS contested that Loya had officially requested an accommodation.  The Court finds that there is sufficient evidence in the record to create a genuine dispute as to this material fact.  In Brown's deposition, she acknowledged that Loya had "asked to be moved back to the Portals building." Pl.'s Opp'n, Brown Dep. at 66.  When asked whether Loya had cited her diabetes as one reason for that move, Brown responded, "I think she did." *Id.*; *see also* Loya Dep. at 65 (responding affirmatively to the question of whether she alerted OHS management to the health risk posed by travel between the Portals and Aerospace

refusal was an unlawful denial of a reasonable accommodation for her disability.  HHS contends

that it did not fail to accommodate Loya because her claim that traveling between the Aerospace

and Portals buildings posed a health risk is "disingenuous."  Def.'s Mot. at 22.  HHS points out

that: (1) exercise is generally recommended for diabetes; (2) a shuttle operates between the

Aerospace and Portals buildings; (3) Loya's work could be done primarily over the phone; and

(4) despite management's directive to work in the Aerospace building, Loya often worked in the

Portals building anyway.

By asserting these reasons, the Court understands HHS to contend (1) that Loya was not

required to travel between the Aerospace and Portals buildings as part of her job, (2) that even if

such travel was required either (i) the disease did not hinder Loya's travel between buildings or

(ii) the shuttle constituted a reasonable accommodation for her diabetes and, finally, (3) that even

if Loya was required to move between buildings, hindered from doing so by her diabetes and

unable to rely on the shuttle as a reasonable accommodation, because Loya nonetheless managed

to travel between the buildings she evidently did not require any accommodation to enable her to

do so.[16]

---

buildings because of her diabetes).  Requests for reasonable accommodation need not be formal
or in writing.  *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) (noting
that the notice or request for a reasonable accommodation "does not have to be in writing, be
made by the employee, or formally invoke the magic words 'reasonable accommodation'" as
long as it "make[s] clear that the employee wants assistance for his or her disability").  In
addition, HHS has pointed to the Court to no established agency procedures that disabled
employees must follow in order to request an accommodation that would have required Loya to
make a more formal request.  Accordingly, the Court finds that a reasonable jury could find that
she requested a reasonable accommodation under the Rehabilitation Act.

[16]     HHS does not argue that transferring Loya to the Portals building would have imposed an
undue hardship.

A reasonable jury could, as Loya asserts, reject each of these arguments.  First, a reasonable jury could credit Loya's testimony that her job duties frequently required her to travel between buildings.  Loya Decl. ¶ 20.  Second, a reasonable jury could similarly credit her testimony that walking between the buildings put her in danger of hypoglycemia or hyperglycemia, and that Loya's diabetes therefore limited her ability to travel by foot.  Loya Decl. ¶¶ 19–20.  Third, a reasonable jury could conclude that the shuttle did not provide a reasonable accommodation of Loya's diabetes by enabling her to travel between buildings without walking.  Loya Dep. at 66 (noting that the shuttle ran approximately every 50 minutes and she needed to be in the Portals building multiple times a day); *see also* Loya Decl. ¶ 20 (stating that she "frequently" had to go to the Portals building "unexpectedly" for "unanticipated meetings").  Loya's testimony is sufficient to create a genuine dispute of fact as to whether travel between buildings was required by her job, whether her diabetes limited her ability to walk between buildings, and whether the shuttle provided a reasonable accommodation of that disability.

HHS's final argument is more complicated, but it too is unconvincing.  In essence, HHS argues that it is entitled to summary judgment on Loya's Rehabilitation Act claim because she evidently managed to walk between the buildings in spite of what a reasonable jury could find was a risk to her health from doing so.  HHS begins this argument by pointing out that, although Loya's office was located in the Aerospace building, Loya in fact came to the Portals building on a daily basis.  *See* Loya Dep. at 66, 69.  Therefore, HHS argues, although Loya's disability may have hindered her from walking between the buildings, it did not prevent her from doing so.  HHS concludes that no accommodation for Loya's diabetes was necessary and that it was

therefore not required to provide any.  As recognized in *Edwards v. EPA*, 456 F. Supp. 2d 72

(D.D.C. 2006), however, the language of section 501 of the Rehabilitation Act and its

implementing regulations do not require a showing of "necessity."[17]

The *Edwards* court distinguished between Title III of the ADA, which explicitly makes

necessity a part of the reasonable accommodation inquiry, and section 501 of the Rehabilitation

Act, which does not.  456 F. Supp. 2d at 99–100.  Title III of the ADA "defines actionable

disability discrimination as the 'failure to make reasonable modifications . . . when such

modifications are *necessary* to afford such goods, services, facilities, privileges, advantages, or

accommodations to individuals with disabilities.'" *Id.* at 99 (quoting 42 U.S.C. §

 12182(b)(2)(A)(ii)).  By contrast, "neither the statutory text of § 501 [of the Rehabilitation Act]

(which speaks in general terms) nor the more specific regulations limit a federal employer's

liability for failing to provide a requested accommodation to situations in which the

accommodation was 'necessary' to allow the employee to perform the essential functions of his

or her position."  *Id.* at 100; *see also* 29 C.F.R. § 1630.2(o)(1)(ii) (defining reasonable

accommodations to include "[m]odifications or adjustments to the work environment . . . that

enable a qualified individual with a disability to perform the essential functions of that

position").[18]  Accordingly, the *Edwards* court concluded, "[a]bsent a firm basis in the text of the

---

[17]    Instead, the case law indicates that plaintiffs need not show necessity, but rather, must simply demonstrate some causal connection between the limitations caused by their disability and the accommodation sought.  *See Desmond v. Mukasey*, 530 F.3d 944, 959 (D.C. Cir. 2008) ("[T]here must be some causal connection between the major life activity that is limited and the accommodation sought." (quoting *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 785 (7th Cir. 2007) (internal quotation marks omitted)); *Adams v. Rice*, 531 F.3d 936, 953 (D.C. Cir. 2008) ("[T]he accommodation sought must relate to the limitation at issue.").

[18]    That this provision of Title III of the ADA would set a higher standard for actionable discrimination than section 501 of the Rehabilitation Act is unsurprising.  The cited provision of

statute or the governing regulations, the Court is reluctant to conclude that . . . insufficient proof

that the requested accommodation was 'necessary' constitutes an independent basis for rejecting

an employee's request for a reasonable accommodation under § 501 of the Rehabilitation Act."

*Id.*[19]

     This Court agrees with the reasoning of the *Edwards* court.   Providing a reasonable

accommodation that is necessary to enable a disabled employee to perform the essential

functions of her job may be the *minimum* that a federal agency is required to do, but there is no

---

Title III of the ADA prohibits discrimination in public accommodations, while the Rehabilitation Act establishes the federal government as a "model employer" of disabled persons, *see* 29 C.F.R. § 1614.203(a), and imposes upon the federal government an affirmative obligation to accommodate the handicapped.  29 U.S.C. 791(b).  It therefore follows that disabled federal employees seeking a reasonable accommodation from the government would have to satisfy a less stringent standard.

[19]     Other authorities provide additional support for the conclusion reached in *Edwards*.  For instance, the regulations defining those protected by the Rehabilitation Act expressly contemplate protections for employees who can perform their jobs without an accommodation. *See* 29 C.F.R. § 1630.2(m) (noting that employees qualify for the protections of the Act if they can perform the essential functions of their job "with *or without* reasonable accommodation") (emphasis added); *see also Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994) ("[A]n individual with handicaps is 'qualified' [for purposes of the statute] . . . if she can perform the essential functions of her position with reasonable accommodation.  If she can perform these functions without reasonable accommodation, so much the better—she is, of course, still qualified."). Further, in the appendix to the regulations governing section 501 of the Rehabilitation Act, the EEOC repeatedly characterizes reasonable accommodations as accommodations that "assist" a disabled employee in the performance of her job.  *See* 29 C.F.R. app. § 1630.9; *see also* Exec. Order No. 13164, 65 Fed. Reg. 46565, § 1(b)(5) (July 26, 2000) (ordering federal agencies to promulgate procedures to facilitate the provision of reasonable accommodations, including procedures stating that agencies may request additional medical information if the employee has not established "the need for the reasonable accommodation, or . . . how the requested accommodation will *assist* the employee to perform the essential functions of the job") (emphasis added).  This language suggests that a plaintiff seeking a reasonable accommodation need only demonstrate how the accommodation would help address the limitation caused by her disability, not that an accommodation is absolutely necessary to the performance of her job.

statutory or regulatory basis on which to conclude that it is never required to do more.  *Cf.*

*Carter v. Bennett*, 840 F.2d 63, 67 (D.C. Cir. 1988) (holding that an agency "must, *at a*

*minimum*, provide reasonable accommodation as is necessary to enable [a disabled employee] to

perform his essential functions") (emphasis added).[20]  In other words, "the fact that plaintiff

could do [her] job without any accommodation does not in and of itself disqualify [her] from

ever requesting or receiving an accommodation."  *Edwards*, 456 F. Supp. 2d at 100 n.7.  A

reasonable jury could therefore find that, although a reassignment to the Portals building may not

have been strictly necessary for Loya to perform her job, it would nonetheless have "assist[ed]"

Loya "in performing the duties of [her] job," 29 C.F.R. app. § 1630.9, by reducing her risk of

hypoglycemia or hyperglycemia and so assisting her in performing the job duties that (a

reasonable jury could find) required her to travel between buildings.

     In sum, Loya has raised a genuine issue of fact as to whether she was entitled to an

accommodation because of her diabetes, notwithstanding evidence tending to show that the

---

[20]     There is, however, a line of cases that state that plaintiffs "must establish that 'an
accommodation was needed' in order to carry out the essential functions of the position."  *Dage
v. Leavitt*, 2007 WL 81961, at *7–8 (D.D.C. Jan. 9, 2007) (quoting *Bissell v. Reno*, 74 F. Supp.
2d 521, 528 (D. Md. 1999)); *see also Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997)
(affirming the grant of summary judgment because the "plaintiff failed to establish that the
requested accommodation was necessary in order for [a disabled employee] to perform the
essential functions of his job").  The Court is not persuaded by these cases.  Their reasoning is
not grounded in the language of the Rehabilitation Act or its implementing regulations.  Instead,
they appear to create the necessity requirement out of whole cloth by conflating the causal-
relationship requirement with a more strict necessity requirement.  *See, e.g.*, *Gaines*, 107 F.3d at
1178 ("In order for a plaintiff to prevail on an allegation based on failure to reasonably
accommodate, he must establish that: . . . (4) an accommodation was needed, i.e., a causal
relationship existed between the disability and the request for accommodation . . . .").  Further,
they do not account for the Rehabilitation Act's explicit instruction that handicapped employees
who can perform the essential functions of their job "with *or without* accommodation" qualify
for the protections of the Act.  *See* 29 C.F.R. § 1630.2(m) (emphasis added).

accommodation she requested was not "necessary" for her to do her job.[21]  A reasonable jury could find "'(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make the accommodation,'" *Woodruff*, 777 F. Supp. 2d at 39 (quoting *Graffius*, 672 F. Supp. 2d at 125).  Accordingly, HHS's motion for summary judgment on Loya's Rehabilitation Act claim must be denied.

---

[21]     Additionally, as Loya points out, there is no evidence that HHS engaged in the good faith interactive process required by federal regulations to determine a suitable reasonable accommodation.  *See* 29 C.F.R. § 1630.2(o)(3); *Graffius*, 672 F. Supp. 2d at 129 n.13.

**IV. CONCLUSION**

For the foregoing reasons, it is this 10th day of January 2012 hereby

**ORDERED** that HHS's motion for summary judgment [Dkt. # 26] is **GRANTED** insofar as it seeks summary judgment on Loya's Title VII claims arising from her office relocation; and **DENIED** insofar as it seeks summary judgment on Loya's Title VII claims arising from her reduction in responsibilities; and **DENIED** insofar as it seeks summary judgment on Loya's Rehabilitation Act claim.

Royce C. Lamberth
Chief Judge
United States District Court
    for the District of Columbia
